**MICHELLE HOLMAN KERIN**, OSB No. 965278
michelle@angelicalfo.com
**JOANNA PERINI ABBOTT**, OSB No. 141394
joanna@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Peter Igwacho*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:22-CR-00283-AN |
| Plaintiff, | **DEFENDANT PETER IGWACHO'S SENTENCING MEMORANDUM** |
| vs. | |
| PETER IGWACHO, | |
| Defendant. | |

## INTRODUCTION

Mr. Igwacho stands before this Court as a 64-year-old immigrant who has spent nearly thirty years in this country building a life defined by family, education, and service to people most others ignore and refuse to help. And now a single course of criminal conduct will erase that life entirely.

For more than a decade in Anchorage, Alaska, Peter Igwacho has housed and supervised the chronically mentally ill, the homeless, and the formerly incarcerated; individuals cycling between jail cells, psychiatric wards, and the streets. He has taken clients other providers would not accept. He has supervised men with violent histories, severe addiction, and profound

psychiatric instability. He has done so not from a distance, but personally, overseeing medication compliance, transportation to treatment, daily meals, and basic dignity. Corrections officials, licensed clinicians, attorneys, and case managers uniformly describe him as a stabilizing force in a system that too often fails the most vulnerable.

To be clear, Mr. Igwacho understands he was convicted of a serious financial crime, and the Court must account for this. However, it did not involve violence, exploitation of the vulnerable, or abuse of those under his care. It did not leave individuals physically harmed. It arose during a moment of national economic upheaval, when government relief funds were rapidly deployed and oversight lagged urgency. That context does not excuse the conduct but § 3553(a) requires the Court to examine all of the circumstances fully and honestly, and not in isolation.

Significantly however, whatever custodial sentence this Court imposes will be only the beginning of Mr. Igwacho's punishment. This conviction will end Mr. Igwacho's career, deprive him of his ability to pursue his passion, and strip him of his professional endeavors. Even more impactful, it will separate him from his United States citizen children, his family, and friends. This conviction will result in his removal from the United States and require him to return to a country in violent political unrest, where deportees are frequently detained, interrogated and worse, upon arrival.

The question before the Court is not whether punishment is warranted. It is what punishment is sufficient, and no more than necessary, considering the full human context of this case.

As outlined below, a sentence of 12 months and a day, served in home confinement, reflects accountability and proportionality. It is not charity, or a slap on the wrist. Instead, it is

PAGE 2 – **DEFT.'S SENTENCING MEMORANDUM**

solidly grounded in the Sentencing Guidelines and the mandate of 18 U.S.S.C. §3553. It recognizes that Mr. Igwacho has devoted his life to sustained public service, and that the collateral consequences he faces are extraordinary and irrevocable.

## DISCUSSION

I.    **Background**

   A.    **Mr. Igwacho Has Been in the United States for more than 30 Years, is a Devoted Family Man, and Has Deep Roots in the Community.**

Peter Nji Igwacho was born in 1961, in Mamfe, Cameroon, in Central Africa (PSR ¶¶ 9, 52).[1] He was raised in a "traditional African family household," spending his youth assisting with work on his family's farm while attending school daily (PSR ¶ 53). He was close with his many siblings and parents. Indeed, his sister Clara describes him as "the father figure of our entire family" since his parents' death and that "he has always been a responsible and helpful member of our family." (C. Igwacho Letter, p.1)[2]

In 1997, Mr. Igwacho emigrated to the United States, first residing in Silver Spring, Maryland, and then in Minneapolis, Minnesota (PSR ¶ 55). He later relocated to Anchorage, Alaska, where he has lived since approximately 2007 (PSR ¶ 55). He is in the United States legally as a lawful permanent resident (PSR ¶ 9). However, because of this conviction and because of the current policies of the Trump administration, his legal status in the United States will almost certainly be revoked and he will be deported to Cameroon.[3]

---

[1] The Presentence Report dated February 12, 2026 is cited as "PSR."

[2] The numerous letters in support of Mr. Igwacho, are attached to the Confidential Submission to the PSR, filed contemporaneous and under seal.

[3] Mr. Igwacho's immigration counsel has confirmed his conviction in this case is almost certainly an immediately deportable offense, with a low likelihood of any success in challenging the revocation of his permanent residence status and/or halting deportation. Moreover, as news

Mr. Igwacho is the father of five children. He has three adult children from prior relationships (PSR ¶ 54), and two younger children from his marriage to Delphine Atu-Tetu including a 15-year-old daughter who currently resides with him in Anchorage (PSR ¶ 55). He is a dedicated father who, as one of his daughters notes, is "compassionate, selfless, and devoted to helping others." (C. Igwacho Letter, p. 1; N. Igwacho Letter, p. 1).

Mr. Igwacho earned a degree in international relations from the University of Yaoundé in Cameroon in 1986 (PSR ¶ 63). After relocating to the United States, he completed a master's degree in human services through Capella University in 2007 and has obtained licenses in Alaska as a Chemical Dependency Practitioner and Substance Abuse Treatment Practitioner in 2018 (PSR ¶ 63).

**B.     Mr. Igwacho Has Devoted His Life to Serving the Most Vulnerable Populations in His Community and Has Made an Overwhelmingly Positive Impact.**

For almost twenty years, Mr. Igwacho has worked in the human services field in Anchorage, Alaska (PSR ¶¶ 2, 56). After relocating to Alaska, he operated an assisted living facility focused on serving individuals with disabilities and later moved into transitional housing and reentry services for individuals experiencing homelessness and those leaving custody (PSR ¶¶ 56, 64). This work is profound. And difficult. And overlooked. But it has made a substantial positive impact on Mr. Igwacho's community.

---

reports and multiple court orders demonstrate, there is a legitimate concern that this administration will take actions that deprive him of his full legal ability and constitutional rights to fight deportation. Indeed, courts in this district have seen the lawlessness and cruelty of the current administration's immigration policies unfold right here in Oregon. See, *O-J-M v. Drew Bostock, et al.*, Case No. 25-cv-944-AB (forceable abduction by masked ICE agents of asylum seeker after her immigration matter was dismissed; Judge Baggio found that "Petitioner's substantial interest in her liberty has been erroneously deprived by the Government without procedural due process through the series of Government actions." *Id*. at Dckt No. 32).

The letters of support submitted to this Court describing Mr. Igwacho's work—from clinicians, social workers, case managers, law enforcement collaborators, family members, and former clients' families—describe not simply a professional, but a man whose life has been defined by compassion, dignity, and an uncommon willingness to serve those that others cannot or will not serve.

Given his current position, he is no stranger to the criminal justice system. But not because of this case or any other single case; it is because his work has focused, in large part, on providing support to people who require transitional housing after serving their time in Alaska's prison system. Mr. Igwacho "believes strongly in second chances and has dedicated much of his life to helping people rebuild theirs." (N. Igwacho Letter, p. 1) As noted in the letters, many, if not most, of his residents have significant mental illness or cognitive deficiencies and Mr. Igwacho, as a result takes on tremendous responsibility for individuals who are ignored by society, are at the edges of a nominal safety net, and sometimes, because of addiction or mental illness, pose a safety risk to Mr. Igwacho and others. [4] (Adoko Letter, p. 1) As Frank Adoko, a lawyer in Anchorage, puts it "[i]n a world that prefers to distance itself from former inmates, often with disdain, Mr. Igwacho has for many years opened his doors and provided a transitional home for them." (Adoko Letter, p. 1)

And in doing so, Mr. Igwacho has made a substantial contribution to society. Rex Butler, a prominent lawyer in Anchorage notes, "Mr. Igwacho help[s his clients] to find safe, reliable places to live; employment or classes to help them generate their own income and steer people in the right direction. It's not glamorous, nor does it pay very well but nonetheless, Mr. Igwacho

---

[4] Mr. Adoko described that Mr. Igwacho "provides a necessary service very few people are willing to provide because it is not financial rewarding and that comes with the risk of serious physical injury and other kinds of abuse on a daily basis." (Adoko Letter, p. 1)

was and is always willing to stand in that gap, in the hopes of helping other find a successful reintegration back into society." (Butler Letter, p. 1)

Collet Robertson, whose brother was housed at Yukon, explains that Mr. Igwacho "treated my brother with a level of care, patience, and compassion that went far beyond what was required of him professionally." (Robertson Letter, p.1) During her brother's struggles with addiction and mental illness, Mr. Igwacho "became more than just a caseworker or counselor — he became like a father figure" and "made sure Colin had food, shelter, and dignity." (Robertson Letter, p.1) Even after her brother passed away, Mr. Igwacho "checked on us often, offered support, and helped with anything we needed," actions he "didn't have to do… but he did, out of genuine love and kindness." (Robertson Letter, p.1) She describes him as "a man of deep compassion, integrity, and humanity." (Robertson Letter, p.1)

Independent case manager Nina Gorman-Dundas, who works with re-entry populations, describes clients who often end up "back in prison, on the streets or dead." She writes that "Mr. Igwacho is part of the solution with trying to save these men and help them get their needs met the best he can, when other facilities would not take them in due to their criminal history." (Gorman-Dundas Letter, p.1) Her summation is simple but telling: "He goes the extra mile and cares. Maybe a little too much!" (Gorman-Dundas Letter, p.1)

Dr. Onome Okurume, a Psychiatric Mental Health Nurse Practitioner who has known Peter for over fifteen years, notes that although "there are a number of paths he could have chosen," he "opted to provide much needed care and services to underserved populations including mentally ill and homeless people." (Okurume Letter, p.1) She emphasizes that "Mental health care is a calling and one in which [Mr. Igwacho] has consistently shown both interest and passion," and that "even as he awaits sentencing [Mr. Igwacho] is back in his transitional living

PAGE 6 – **DEFT.'S SENTENCING MEMORANDUM**

home seeing to the needs of his clients because that is the type of person he is: humble, kind and worrying about the needs of others" (Okurume Letter, p.1 ). Indeed, to this day and despite his conviction, he continues to receive referrals from the State of Alaska to carry on his important work.

Connie Ambler, LPC, who testified at trial and was with the Alaska Department of Corrections, provides detailed context regarding the systemic gaps in Anchorage's housing and mental health infrastructure. She explains that to understand Mr. Igwacho's role, one must understand the deficiencies in existing services. (Ambler Letter, p.1) Against that backdrop, she states that Mr. Igwacho "provides our most complex and difficult to serve individuals a home called Yukon House which he personally oversees." (Ambler Letter, p.2)

At Yukon, Mr. Igwacho ensures daily meals, medication oversight, appointment transportation, and structured programming. But, as Ms. Ambler emphasizes, "most importantly, Peter treats each client with the utmost respect. He speaks to each one with a voice of calm reassurance and encouragement." (Ambler Letter, p.3) She concludes that he "does not 'hold a position' or 'do a job.' Rather, he pursues his life's work of service to a group of people whose lives are, effectively, a matter of indifference to a system that has found no way to adequately meet their needs." (Ambler Letter, p.4)

Aretha Tyus, LCSW, describes Yukon as "a pillar of the Anchorage community" that "fills a crucial gap in ensuring these individuals remain in the community instead of cycling in/out of the psychiatric hospital, the Department of Corrections, and homelessness." (Tyus Letter, p.1) She has "witnessed Mr. Igwacho's commitment to being the extension, the hand-up that is needed for such individuals to be successfully cared for and maintained with dedication and compassion." (Tyus Letter, p.1)

PAGE 7 – **DEFT.'S SENTENCING MEMORANDUM**

Delphine Atu-Tetu, who has known Mr. Igwacho for over twenty-five years and is the mother of his children, explains that although he had "a number of paths he could have chosen," he returned to "his true calling—serving the most marginalized members of our community." (Atu-Tetu Letter, p.1) She describes his program as "one of the few in the state with low-barrier entry, meaning he accepts clients others cannot." (Atu-Tetu Letter, p.1) What she finds most extraordinary is that "despite their histories of mistrust, trauma, and instability, they are drawn to him. They trust him." (Atu-Tetu Letter, p.2) She further notes that Mr. Igwacho built and sustained his program "without the support of grant funding," having "shouldered the financial and logistical burdens himself, driven solely by his passion and commitment to those society often overlooks." (Atu-Tetu Letter, p.2)

Community Case Manager Chaz Hedgspeth writes that he has "seen Mr. Igwacho house and ultimately take care of not only many of [his] personal clients, but also clients [he has] not directly worked with," and that the homes he manages have been "above average compared to the homes [he sees] on a daily basis." (Hedgspeth Letter, p.1) He has personally witnessed Mr. Igwacho "spend money from his own pocket to meet the needs of the clients he cares for in his home" (Hedgspeth Letter, p.1) and confirms that Mr. Igwacho houses "the most acute, intense cases of behavioral health clients… clients that have been too sick to house at your average home." (Hedgspeth Letter, p.1)

Rebekah Clay, LPC, formerly a Mental Health Clinician with the Alaska Department of Corrections, explains that she regularly referred severely mentally ill individuals to Mr. Igwacho because she "knew we were sending patients to a safe supportive place where their needs would be met." (Clay Letter, p.1) She describes him as "incredibly compassionate" and someone who would "go above and beyond" to ensure clients had appointments, food, medications, and winter

clothing. (Clay Letter, p.1) She concludes that he "has had such a positive impact on our community and is truly irreplaceable." (Clay Letter, p.1)

Finally, Mr. Igwacho's daughter, Nathalie Igwacho, provides personal insight into his character. She describes him as "compassionate, selfless, and devoted to helping others." (N. Igwacho Letter, p.1) She recounts witnessing firsthand the patience required to manage residents with complex needs and states that many residents saw him "not just as a program director, but as a father figure — someone who believed in their ability to improve when everyone stopped believing in them." (N. Igwacho Letter, p.1) She concludes: "My father is not a perfect man — none of us are — but he is a good man. A man whose entire life has been defined by helping others stand back up when they've fallen." (N. Igwacho Letter, p.2)

### C.    Mr. Igwacho has had Exemplary Behavior While on Release for Nearly Four Years.

Throughout Mr. Igwacho's period of pretrial release—spanning almost four years—Mr. Igwacho has remained fully compliant with supervision (PSR ¶ 7). He has appeared at every court hearing and complied with each of this Court's conditions. The PSR rightly recommends that he is suitable for voluntary surrender. (PSR ¶ 7; p. 3 Voluntary Surrender)

## II.    The Sentencing Guidelines in the PSR Are Correctly Calculated but Should Not Be Given Outsized Importance.

The fundamental tenet of federal sentencing is clear: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. §3553(a)]." 18 U.S.C. § 3553(a). In applying this principle, courts are instructed to take a comprehensive view of the individual and the offense, weighing a variety of factors to arrive at a just sentence.

The Sentencing Guidelines serve are a starting point. As the Ninth Circuit has explained, the Guidelines are only "one factor among the § 3553(a) factors that are to be taken into account

in arriving at an appropriate sentence," and they are not to be given "more or less weight than any other." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

### A.    Guidelines Calculation

Mr. Igwacho agrees that the Guidelines are correctly calculated in the PSR, as follows:

| | |
|---|---|
| Base Offense Level (USSG §2B1.1 (a)(1)) | 7 |
| Loss more than $150,000 but less than $250,000 (USSG §2B1.1(b)(1)(F)) | 10 |
| **Adjusted Offense Level** | **17** |

Probation has also correctly calculated his criminal history as Category 1, resulting in an advisory Guidelines range of 24 to 30 months.

As the Court well knows, it has broad discretion to impose a downward variance "based solely on policy considerations," including a court's disagreement with the rationale or structure of a particular guideline. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). That discretion applies "even where that disagreement applies to a wide class of offenders or offenses." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc).

This principle carries particular weight when the relevant guideline, as here, lacks grounding in empirical data or national sentencing experience. See *Kimbrough*, 552 U.S. at 109–10. Section 2B1.1, the fraud guideline, is a prime example of the lack of empirical support. Rather than emerging from data or sentencing experience, the fraud guideline has evolved primarily through politically driven directives that ratchet up sentences without meaningful calibration to culpability. See *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring) (noting that recent increases to the fraud guideline were adopted "without the benefit of empirical study," rendering the guideline "fundamentally flawed"). Courts have described the resulting sentencing ranges as "irrational on their face," particularly

where loss is the sole—or overwhelming—driver of the offense level. See *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) (criticizing sentences tied to the guidelines' reliance on a "single factor—loss or gain" as "irrational on their face," and imposing a 24-month sentence where the guideline range was 78–97 months); see also *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 8 27, 2018) (describing "the feeble underpinnings of the loss enhancement"); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (noting that the fraud guidelines have "frequently been criticized"); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) (loss-driven sentencing paradigm "does not provide realistic guidance").

These concerns are not academic. On August 6, 2025, the U.S. Sentencing Commission announced that, as a policy priority for the 2025-2026 amendment cycle, it will examine whether § 2B1.1 "appropriately reflect[s] the culpability of a defendant and harm to victims," in light of widespread criticism that the "overly punitive loss table" produces "sentencing ranges unmoored from individual culpability" and that, particularly in conspiracy cases, "individual gain is often a better measure of culpability" than "overall loss." And since that time the Sentencing Commission has proposed vast amendments to the fraud guidelines that would alter significantly this Court's analysis in this case, as discussed below.

One of those was amendments proposed on December 12, 2025, where the Sentencing Commission recommended significant revisions to the loss tables in § 2B1.1. The overdue and long clamored for amendments decrease the number of tiers and include wider ranges of loss amounts for each resulting tier. If the proposed amendments were in effect right now, Mr.

Igwacho's loss enhancement would be an offense level increase of 8 and not 10.[5] Accordingly, we respectfully urge the Court to accord diminished weight to the loss-driven enhancements in determining a sentence that is "sufficient, but not greater than necessary" under § 3553(a). See, e.g., *United States v. Figueroa-Beltran*, 995 F.3d 724, 735 (9th Cir. 2021)(district courts have discretion to grant variances based on proposed amendments that have been promulgated but not yet adopted).

### B. A Sophisticated Means Enhancement is Not Appropriate.

#### 1. The conduct here is not sophisticated.

The government contends that a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) is appropriate because they believe Mr. Igwacho used sophisticated means in executing the counts of conviction. This Court should reject this contention out of hand, just as the United States Probation Office in the PSR did.

The sentencing guidelines direct the Court to increase a defendant's offense level by two points **only if** "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C). Application Note 9(B) provides "sophisticated means" is conduct that is:

> **especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.** For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

(emphasis added).

---

[5] U.S. Sent'g Comm'n, Proposed 2026 Amendments to the Sentencing Guidelines (Dec. 12, 2025), https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf at p. 59 (last visited January 1, 2026).

There is no especially complex or intricate offense conduct present in this case and therefore, the enhancement is not applicable. Indeed, this is a garden variety PPP loan fraud case and not one involving intricate or otherwise sophisticated conduct. The only conduct that could even arguably be "sophisticated" is the submission of false tax and other documents. However, that is not especially complex or intricate to warrant this enhancement. Indeed, every PPP applicant was required to submit tax and other documentation to obtain the loan and therefore, such false documentation is present in most, if not all, PPP loan fraud cases. Applying a sophisticated means enhancement in this case where the purported "sophisticated" conduct is present in every similar case, renders the enhancement meaningless.

2. **The Sentencing Commission has proposed significant revisions that would resolve any doubt that Mr. Igwacho's conduct was not sophisticated.**

To that end, the Sentencing Commission has recognized that Courts and the government over apply this enhancement to encompass conduct that is not in fact "sophisticated" at all and have proposed an amendment to the definition of sophisticated means designed to narrow the enhancement's application.[6] The Sentencing Commission's amendment would define sophisticated means as "committing or concealing an offense **with a greater level of complexity than typical for an offense of that nature.** Such complexity may be achieved through various methods, including by using advanced or emerging technologies [in ways not routinely employed by everyday users][in a more specialized, elaborate, or unusual way than an ordinary user would]. Sophisticated means are often used to increase the scale of the offense or to make especially difficult the detection of the offense [or the detection of the defendant's participation

---

[6] U.S. Sent'g Comm'n, Proposed Amendments to the Sentencing Guidelines (Dec. 12, 2025), at 155-168, https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf (last reviewed February 18, 2026).

in the offense].” *Id.* at 155-168 (emphasis added).  The proposed amendment acknowledges what has long been observed—the sophisticated means enhancement has improperly been applied to conduct that is in fact not intricate, but routine.

If this proposal were in effect today, there would be no question that Mr. Igwacho's conduct in this case does not meet this definition because it is the same as conduct that occurs in virtually every other case involving PPP loan fraud. If, when calculating Mr. Igwacho's sentencing guidelines, the Court determines that the sophisticated means enhancement as written today should apply, it should nonetheless discount it and find a downward variance of two levels based on the Commission's findings and proposed amendment.

### C, Given the Proposed Amendments, This Court Should Apply a Substantial Variance and Impose a Sentence of Home Detention.

Additionally, on January 30, 2026, the U.S. Sentencing Commission also proposed significantly broadening Zones B and C to include defendants, like Mr. Igwacho, to be eligible for alternatives to incarceration.[7]  The proposed amendments affirm that "Congress recognized the important role of non-imprisonment sentences when it established probation as a sentence in itself as part of the Sentencing Reform Act. [As the criminal justice system continues to develop more advanced tools to assess and respond to individual defendants' unique risks and needs, the court should consider the resources available to address the defendant's needs, and the setting in which those resources can be provided, in determining the appropriate sentencing option.] The Commission intends for [§5A1.1 (Determination of Type of Sentence)][Chapter Five] to support the court's "full exercise of informed discretion in tailoring sentences to the circumstances of

---

[7] U.S. Sent'g Comm'n, Reader-Friendly Version of Proposed Amendments to the Sentencing Guidelines (Jan. 30, 2026), at p.14  https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf  (last reviewed February 18, 2026).

individual cases." S. Rep. No. 225, 98th Cong., 1st Sess. 91 (1983). The proposed amendment would mean Mr. Igwacho's final resulting offense level would fall in Zone B. This would direct courts to consider a custodial sentence served in home confinement, among other things. Here are the relevant proposed revised zones:



The substantial overhaul of the fraud guidelines and the widening of eligibility for alternative sentences for defendants in Criminal History category one is significant and cannot be overlooked by this Court. They reflect that the widespread criticism by the academics, the bench and the bar, of the fraud guidelines as overstating culpability and over incarcerating individuals have merit. Mr. Igwacho should not be treated worse in February 2026 than he would if he were sentenced later this same year.

If the proposed amendments were in effect right now, the resulting guideline range would be dramatically different—indeed almost half of what the government is asking for. For

example, there could be no legitimate argument by the government that the sophisticated means enhancement is applicable, Mr. Igwacho would have two fewer points for loss, a much lower resulting guideline range, and he would be in a Zone B, with a direction to this Court to consider an alternative to a prison term, including home detention. Here is what his guidelines would look like under the proposed amendments:

| Base Offense Level (USSG §2B1.1 (a)(1)) | 7 |
|---|---|
| Loss more than $95,000 but less than $250,000 (USSG §2B1.1(b)(1)(F)) | 8 |
| **Adjusted Offense Level** | **15** |
| Zone | B |
| Resulting Guideline Range | 18-24 months |

And this is before any other 18 U.S.C. §3553(a) variance.

For these reasons and those outlined below, the Court should impose a substantial downward variance from Mr. Igwacho's resulting guidelines range and impose a sentence of no more than 12 months and a day to be served in home confinement.

## III. A Significant Variance is Warranted Because Mr. Igwacho will be Deported and Almost Certainly Face Additional Harsh and Severe Consequences as a Result.

### 1. Mr. Igwacho will be deported and likely further detained, interrogated and possibly worse in his home country.

As this Court knows, Mr. Igwacho is a citizen of Cameroon and is in the United States legally via a permanent residence card. Regardless of the custodial sentence this Court imposes, his legal status will be revoked, and he will be deported from the United States upon the

completion of any custodial sentence.[8] Deportation as a collateral consequence of conviction is

recognized as a mitigating factor warranting a departure from the advisory guideline sentence.

After all, a "deported alien may be required to sever family ties, become impoverished and return

to a society in which he no longer can function and may, indeed, face life-threatening conditions.

It has produced drastic consequences in many cases, and will do so in this one. It is in all cases 'a

life sentence of banishment.'" *Lyons v. Pearce*, 298 Or 554, 565 (1985) (en banc) (quoting

*Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J., dissenting)). Deportation is "an

integral part—indeed, sometimes the most important part—of the penalty that may be imposed

on noncitizen defendants who plead guilty to specified crimes." *Padilla v. Kentucky*, 559 U.S.

356, 364 (2010). Indeed, courts around the country, including in this District, have recognized

that harsh immigration consequences serve a valid basis for a downward variance. The reasons

for this are on full display in the instant case.

Mr. Igwacho will be deported to his home country, Cameroon, which has been in

essentially a persistent civil war between two factions of the country— the Francophone-

dominated central government and Anglophone separatists in the country's northwest and

southwest regions.[9] Over the years, particularly beginning in 2016, this divide has caused

---

[8] The current administration has aggressively moved to revoke and deport not just permanent resident status of individuals who are convicted of crimes, but also foreign-born naturalized citizens. Colleen Long, Laura Strickler, Daniella Silva & Nicole Acevedo, *Trump Administration Working to Expand Effort to Strip Citizenship From Foreign-Born Americans*, NBC News (Feb. 12, 2026), https://www.nbcnews.com/politics/immigration/trump-administration-working-expand-effort-strip-citizenship-foreign-b-rcna255427 (last reviewed February 18, 2026).

[9] By way of background, much of this evolved in the 19th and 20th centuries. Germany initially colonized Cameroon. After Germany's defeat in World War I, Cameroon was divided between France and Britain. In 1961, the northern British territory of Cameroon joined Nigeria, while the southern British territory joined the already independent Republic of Cameroon, forming a federal state meant to preserve Anglophone autonomy. In 1972, however, the federal system was abolished in favor of a centralized unitary state, a change many Anglophones view as the

significant civil unrest, including bombings and political killings. Indeed, as recently as late
2025, the opposition leader, who ran in a purportedly failed contested election, was jailed. He
died in custody in December 2025 under suspicious circumstances.[10] Mr. Igwacho, simply
because of where he was born and his family resided and not anything to do with his own
political beliefs, would be deemed a member of the Anglophone minority faction. There are
numerous reports that deportees arriving in Cameroon, especially Cameroonian citizens from the
United States,[11] are further detained upon entry and once they arrive, interrogated and abused.[12]
Mr. Igwacho is extremely fearful of returning to Cameroon given reports from fellow
Cameroonians and numerous news and non-profit organizations, including the Human Rights

---

beginning of the erosion of their promised autonomy. Benneh, G., DeLancey, M.W.
"Cameroon." Encyclopedia Britannica, February 16, 2026,
https://www.britannica.com/place/Cameroon (last reviewed February 18 2026).

[10] https://www.bbc.com/news/articles/ckg9204y4w5o (last reviewed February 17, 2026).

[11] Clara Igwacho, for example, notes "Cameroon is known worldwide to be suffering from the
hands of a president who has been in power for more than 44 years, killing the vulnerable
population." (C. Igwacho Letter, p. 1). Again, this is informed by news reports and other
Cameroonians.

[12] "Human Rights Watch found that Cameroonian authorities have, between 2019 and 2021,
subjected returned deportees and members of their families to serious human rights violations
including rape, torture and other physical abuse, arbitrary arrest and detention, inhuman and
degrading treatment in detention, extortion, and threats. Perpetrators included police, gendarmes,
and military personnel, among other officials and state agents. Armed separatists also beat at
least one deported person and threatened the relatives of others." Human Rights Watch, "How
Can You Throw Us Back?": Asylum Seekers Abused in the U.S. and Deported to Harm in
Cameroon (Feb. 10, 2022), https://www.hrw.org/report/2022/02/10/how-can-you-throw-us-
back/asylum-seekers-abused-us-and-deported-harm-cameroon (last visited February 17, 2026).

Watch and Amnesty International.[13] These independent reports provide real credibility to Mr. Igwacho's fears.

Whatever sentence this Court imposes, Mr. Igwacho, because of this conviction, will face further incarceration, both before and after his deportation, will be delivered to a warring country where he is a member of the oppressed minority faction, and may be exposed to further detention and bodily harm. This real and frightening collateral impact warrants a substantial variance from the guidelines.

> **2.     Mr. Igwacho will have more severe restrictions during incarceration than other similarly situated inmates because he is not a citizen of the United States.**

In addition, because Mr. Igwacho is not a United States citizen and will be subject to removal proceedings and deportation, he will also likely face more severe restrictions in custody than U.S. citizens in custody. While incarcerated, he will likely be precluded from any halfway house time—up to six months—that would otherwise be granted at the end of his sentence. E.g., *United States v. Pacheco-Soto*, 386 F.Supp.2d 1198, 1205 (D.N.M. 2005) (below guideline sentence imposed in drug case because defendant is deportable alien who "faces an unwarranted increase in the severity of his sentence. He likely will not be eligible for any early release, he will not be able to serve his sentence in a minimum-security prison, and he may not qualify for reduced credits for participation in a residential drug or alcohol abuse program. These consequences are severe and unfair."). Many programming opportunities are not available to him as a non-United States citizen. And most significantly, at the end of his term of incarceration, he

---

[13] Amnesty Int'l USA, Cameroon Advocacy Network to Congress and Biden Administration: Why Is TPS for Cameroon Taking So Long? (Dec. 1, 2021), https://www.amnestyusa.org/press-releases/cameroon-advocacy-network-to-congress-and-biden-administration-why-is-tps-for-cameroon-taking-so-long/  (last viewed February 18, 2026).

PAGE 19 – **DEFT.'S SENTENCING MEMORANDUM**

will likely be released to an ICE holding facility for further detention while his deportation is adjudicated. He will not have the ability to self-deport and as outlined above, will face significant risk of both further incarceration and harm once removed to Cameroon. These more severe custodial restrictions than other similarly situated defendants warrant a substantial variance from the guidelines.

### B.    A Significant Variance is Appropriate to Fulfill the Sentencing Goals of Deterrence.

General deterrence is satisfied with a 12-month and a day prison sentence, served through home detention. Home detention is a significant punishment.

Moreover, given his age and the severity of the consequences involved, the risk of recidivism by Mr. Igwacho is effectively zero.[14] *See Pepper v. United States*, 562 U.S. 476, 488 (2011) (courts must consider risk of reoffending); *United States v. Campbell*, 762 F. App'x 877, 879 (11th Cir. 2019) (noting that the District Court's "44-month downward variance reflected the court's consideration of [the defendant's] characteristics, including his age, low risk of recidivism, and family relationship and of the seriousness of his criminal history[]"). Mr. Igwacho has a limited history of criminal conduct and will work to ensure he never comes before this Court again.

### C.    JSIN Data Supports a Sentence of 12 Months and a Day

Judicial Sentencing Information (JSIN) prepared by the United States Sentencing Commission, reflecting sentences imposed nationwide, further supports a substantial variance and undermines the rationale of the government's recommendation.

---

[14] According to the U.S. Sentencing Commission, defendants Mr. Igwacho's age are among the least likely to reoffend and be reconvicted. See, U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, at 11 (2017), https://perma.cc/CZZ7-NRRB (last reviewed February 18, 2026).

PAGE 20 – **DEFT.'S SENTENCING MEMORANDUM**

According to JSIN statistics, from FY 2020-2024, for defendants with a final offense level of 17 under § 2B1.1 and a Criminal History Category I:

- The average length of imprisonment imposed was 15 months; and

- The median length of imprisonment imposed was 16 months.

The JSIN statistics here further support a substantial downward variance. First, treating Mr. Igwacho as statistically "typical," or as the government's recommendation would have it, worse than the average and median cases, would create unwarranted disparity, contrary to section 3553(a)(6). This is inconsistent with the direction to courts that sentencing must reflect the individual defendant and that they may depart from empirical baselines when they fail to capture case-specific realities. *Gall*, 552 U.S. at 50–52; *Kimbrough*, 552 U.S. at 109–10 (2007).

Second, Mr. Igwacho's mitigation, e.g. extraordinary service to the community and the harsh reality of his inevitable deportation, places him well outside the center of the JSIN distribution for § 2B1.1 cases. A sentence of no more than 12 months and a day is, therefore, not an outlier; it is a proportional, individualized sentence that faithfully applies § 3553(a) and is sufficient—but not greater than necessary.

## IV.    A 12-Month and a Day Sentence, Served by Home Confinement, Protects the Public and Satisfies Respect for the Law.

The Court must also consider whether the sentence imposed "reflect[s] the seriousness of the offense, . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The proposed sentence satisfies those goals.

### A.    The Requested Sentence Given Mr. Igwacho's Background Promotes Respect for the Law.

As Congress, courts, and the Sentencing Commission have recognized, non-imprisonment sentences serve a punitive function, and in many cases, adequately serve the

purposes of sentencing when appropriate conditions are imposed. See, S. Rep. No. 225, 98th Cong., 1st Sess. 91 (1983) ("It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose."); *Gall v. United States*, 552 U.S. 38, 48 (2007) (recognizing that though "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms[,]" individuals "on probation are nonetheless subject to several standard conditions that substantially restrict their liberty"). Congress recognized the important role of non-imprisonment sentences as part of the Sentencing Reform Act.

Mr. Igwacho will bear the consequences of this conviction for the rest of his life. The indictment and conviction have undermined his professional reputation, will end his career, and have triggered widespread scrutiny. Moreover, the conviction will mean he will be deported and separated from his family, including his children. These consequences will be lasting and deeply damaging. See, e.g., *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where the defendant's business was destroyed); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance warranted based on reputational harm and media exposure). The requested sentence, therefore, promotes respect for the law.

**B.     The Requested Sentence Protects the Public—Mr. Igwacho is Not a Danger to the Community; He Serves the Public Good.**

A sentence of no more than 12 months and a day, served by home confinement, also protects the public. There is no indication that Mr. Igwacho represents an ongoing risk to the community. Mr. Igwacho has a limited criminal history. He has a loving family and close friends, and he has dedicated himself to providing support and a safe place for Alaska's most vulnerable populations. He has been on pretrial release for almost four years and has fully complied with his conditions. Mr. Igwacho wants to serve whatever sentence the Court imposes,

be with his family, and continue to be a productive member of society, helping others and supporting his family. A longer prison sentence will not protect the public in any meaningful way.

More importantly however, and as explained above, Mr. Igwacho's status as a permanent resident will almost certainly be revoked because of his conviction in this court and he will be promptly deported to Cameroon. His certain removal from the United States means that a shorter custodial sentence than that advocated by the government, will fulfill the goals under 3553(a) and protect the public as aptly as a guidelines sentence would.

## V.     Mr. Igwacho's Personal History and Characteristics Demonstrate That His Criminal Conduct Will Not Be Repeated.

The history and characteristics of Mr. Igwacho reflect decades of service to some of the most severely mentally ill, chronically homeless, and system-involved individuals in Anchorage, Alaska.

As the attached letters demonstrate, Mr. Igwacho's life has been devoted to serving individuals who are chronically mentally ill, frequently justice-involved, and often considered unmanageable by traditional providers. Multiple professionals confirm that he accepts those whom other facilities refuse, personally ensures their medical and daily needs are met, and provides not merely housing but dignity and stability. And despite this conviction, as noted by attorney Rex Butler, "[s]ociety as a whole, needs more people like Peter Igwacho, who are willing to lend a helping hand." (R. Butler Letter, p. 2).

Under § 3553(a)(1), the Court is directed to consider the "history and characteristics of the defendant." The record before the Court reflects a man whose professional identity has been inseparable from sustained service to a uniquely vulnerable population, and whose absence will leave a significant gap in an already strained community mental health system.

PAGE 23 – **DEFT.'S SENTENCING MEMORANDUM**

**CONCLUSION**

Before the Court stands a good, but flawed, man who made mistakes. There is no doubt that Mr. Igwacho was convicted of a serious financial offense that the Court must consider at sentencing. But he is a 64-year-old man whose adult life in this country has been spent stabilizing the mentally ill, housing the forgotten, and helping former inmates rebuild their lives. The letters before the Court describe not rhetoric, but daily acts of service in difficult, often thankless work.

The punishment of this Court will not end with any custodial term it imposes. He will lose his career, his professional identity, his passion and purpose, and he will lose the country he has called home for nearly three decades. He will be permanently separated from his children in

the United States and removed to a nation in active conflict, where detention and instability await. Those consequences are certain. They are severe. And they are lifelong.

A sentence of 12 months and a day, served in home confinement, reflects the seriousness of the offense and promotes respect for the law. Anything more would exceed what is necessary to achieve justice in this case.

DATED: February 18, 2026.

ANGELI & CALFO LLC

*s/Michelle Holman Kerin*

Michelle Holman Kerin, OSB No. 965278
michelle@angelicalfo.com
Joanna Perini Abbott, OSB No. 141394
joanna@angelicalfo.com
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Peter Igwacho*